## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

CHRISTINE BANKS,

    **Plaintiff,**

v.                                                          **4:13cv77**

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    **Defendant.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Christine Banks ("Banks") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits under Title II of the Social Security Act. 42 U.S.C. §§ 401-434. Specifically, Banks argues the ALJ improperly assessed her residual functional capacity ("RFC"), by failing to properly credit the opinions of a treating physician. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

### I.   PROCEDURAL BACKGROUND

Banks previously filed an application for benefits on June

9, 2005, alleging disability since June 8, 2004.  (R. 48-62).
In that claim, the ALJ determined that Banks suffered from
severe impairments of degenerative joint disease of the right
knee and obesity.  (R. 50).  Banks was deemed capable of
performing a limited range of light work with a sit/stand
option.  (R. 51).  The claim was denied at the hearing level by
an ALJ on January 22, 2007, and as Banks did not appeal, it
became administratively final as of that date.[1]

On February 24, 2011, Banks filed another application for
disability insurance benefits ("DIB"), alleging disability
beginning June 8, 2004.  (R. 59, 118-124).  The Commissioner
denied her application initially (R. 67, 68) and upon
reconsideration.  (R. 69-77).  Banks then requested an
administrative hearing, which was conducted on May 14, 2012.
(R. 27-44).

An Administrative Law Judge ("ALJ") concluded that Banks
was not disabled within the meaning of the Social Security Act
and denied her claim for DIB on June 11, 2012.  (R. 14-21).  The

---

[1] In this case, the ALJ noted as a preliminary matter that Banks' current
application for benefits alleged an onset date of June 8, 2004 which falls
within the previously adjudicated period of the ALJ's decision entered on
January 22, 2007.  Thus, the ALJ treated Banks' application as an implied
request for reopening the prior decision.  The ALJ found that Banks filed her
current application on February 24, 2011, "more than four years later," and
as such, the prior decision could not be reopened for "good cause." (R. 16);
see also 20 C.F.R. § 404.988(b).  The ALJ also found none of the statutory
circumstances permitting a later reopening were present.  Id. (citing 20
C.F.R. § 404.988(c)).  Accordingly, the ALJ determined there was no basis to
reopen and revise the prior decision, which "remain[ed] final and binding."
Id.  Banks does not challenge this finding here.

Appeals Council denied review of the ALJ's decision (R. 1-5), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), on June 7, 2013, Banks filed this action seeking judicial review of the Commissioner's final decision. (ECF No. 1). This case is now before the Court to resolve the parties' cross-motions for summary judgment. (ECF Nos. 10, 12).

## II.  **FACTUAL BACKGROUND**

Born January 4, 1957, Banks is a right-handed, 5'9" and 245-pound female with a high school education. (R. 31-32, 138-143). Immediately prior to her alleged onset of disability, Banks worked as an assembler for Canon Industries for six years. (R. 33). She left her job in 2004 due to what she described as "constant pain" she suffered from "constant[ly] sitting" and "the cold air that was constantly blowing on [her] knee and [her] back." (R. 34). Banks has not worked since that time. (R. 33).

On September 13, 2004, Banks presented to Nurse Practitioner Diane Smail ("Smail") with complaints of chronic back pain. (R. 267). Smail's notes reflect that Banks had suffered a muscle strain in her chest while at work "and became discouraged and quit her job." (R. 267). Since quitting, her chest pain apparently receded as she was "not lifting so much." Id. Regarding her back, Smail opined that a breast reduction

3

would "be very helpful." Id.  Banks underwent breast reduction surgery in January of 2005 (R. 361), but its effect on her back pain is not clearly described in the Record.

On March 30, 2007, Banks presented to Dr. Bruce Reid ("Reid") for an evaluation of her right knee.  (R. 361).  Dr. Reid's notes reflect that Banks had a history of advanced patellofemoral disease, and had suffered from right knee pain since May 2005.  Id.  On this particular occasion, Banks reported "continuous pain" in her knee, as well as the ineffectiveness of injection therapy and other conservative treatment measures she had tried up to that point.  Id.  On exam, Dr. Reid observed Banks had "severe localized tenderness on the medial lateral compartment of her right knee," later confirmed by films that revealed tricompartmental arthritis. Given these findings, Dr. Reid decided to proceed with a total right knee arthroplasty, which was conducted on the same day. (R. 362-63).

Despite this surgery, Banks' condition failed to markedly improve.  On January 13, 2009, she visited Dr. Sandra S. Johnson, her primary care physician, complaining of physical pain.  (R. 234-33).  Dr. Johnson noted Banks was a former assembly line worker, "now disabled," who tested positive for right knee pain and depression.  (R. 233).  She observed that Banks, though obese, appeared "oriented and developed,

4

nourished, and not distressed." Id. At a June 16, 2009 follow-up appointment, Banks reported continued bilateral knee pain, as well as pain in her left ankle. Dr. Johnson noted Banks' history of depression, and observed that she appeared alert and oriented, but had crepitus[2] in both knees along with decreased range of motion, right greater than left. (R. 232).

By 2010, Banks developed arthritic pain in her right hand. On February 26, 2010, she visited Dr. Boyd Haynes, III, complaining of persistent pain in her right thumb that had progressed into her shoulder. (R. 406). On exam, Banks' left hand appeared fine, but she had an adducted thumb with a positive grind in her right hand. She also had good grip strength with light-touch sensation at the tip of each digit. Id. Films, however, disclosed "severe 1st CMC[3] DJD with adduction of the 1st metacarpal." Dr. Haynes prescribed Aleve, along with glucosamine and chondroitin sulfate, and discussed the possibility of right hand surgery should her condition persist. Additionally, he noted a pending evaluation of Banks' right knee at a follow-up appointment to address continued complaints of pain following her 2007 knee replacement. Id.

At that follow-up on March 23, 2010, Banks' thumb condition

---

[2] "[T]he grating of a joint, often in association with osteoarthritis." Maureen Barlow Pugh et al. eds. Stedman's Medical Dictionary 424 (27th ed. 2000).
[3] The carpometacarpal ("CMC") joints are the five bones of the hand between the carpus and the phalanges. Pugh et al., supra n.2, at 294, 1099.

seemed slightly improved.  (R. 407).  Dr. Haynes' exam of her right knee, however, indicated problems with her patella.  The knee was capable of full extension, but she had pain to palpation throughout, mostly localized in the patella that worsened when Dr. Haynes attempted to shift it.  Id.  Films indicated a 25-degree angulation of the patella with "the actual bony patella now riding up against the medial femoral condyle."  Id.  Following his examination, Dr. Haynes opined that a thumb reconstruction and a patellar revision of the right knee would improve Banks' condition.  Id.

Banks returned to Dr. Haynes again on July 1, 2010 for another follow-up.  (R. 408).  She expressed a desire to have the thumb reconstruction prior to the patellar revision, and proceeded to discuss that procedure.  Id.  Dr. Haynes also noted that Banks "mentioned something about disability," but "I believe I can fix both of her problems so I am not really an advocate for putting her on disability either."  Id.

Notes from a visit with Dr. Johnson on January 18, 2011 indicate that Banks had surgery on her right hand on November 18, 2010 with Dr. Haynes.  (R. 222).  Banks presented to Dr. Johnson still wearing a brace from the surgery, and still complaining of some discomfort in her hand.  She also reported having consistent pain in her right knee, as well as chronic back pain.  Id.  Dr. Johnson observed that Banks "has been

6

unable to work because of her pain and debility." Id.  On exam, Banks was alert with a normal affect, but positive for back and joint pain, as well as for depression, and had limited range of motion in her right knee.  (R. 223).  Dr. Johnson further opined that Banks should apply for disability due to her "physical limitations and pain."  (R. 221).

On February 15, 2011, Banks followed up with Dr. Haynes. (R. 410).  His notes reflect that she was doing well, "with really no complaints in reference to [her] thumb."  Id.  In fact, it was "doing great."  Id.  Her thumb was in a good position, she had normal sensation to light touch in all digits, and her grip strength was "almost normal compared to her left side."  Id.  While her thumb was doing much better, however, Banks' right knee had continued to deteriorate.  Films showed a "significantly angled patella with contact of the medial true patella with the medial femoral condyle and some calcifications laterally," prompting Dr. Haynes to plan for a right patellar revision with Banks' approval.  Id.  Dr. Haynes also referred her to Dr. Raj Sureja, a physiatrist, to address her complaints of lower back pain.  Id.

Dr. Sureja consulted with Banks on March 9, 2011.  (R. 411-13).  While Banks recalled no specific injury that initiated her back pain, she reported persistent, off and on pain for several decades.  The pain, she claimed, had progressively worsened to

the point that she could not stand or sit for prolonged periods of time. Id. Most recently, her knees had been giving her "much more trouble," and she noticed "more of a stabbing pain in her bilateral hip[,] [as well as] gluteal pain." Id. Bending exacerbated her condition, but she denied any radiation into her legs or lower extremities. Id. On exam, Dr. Sureja found Banks to be alert and oriented with a normal affect and mood. (R. 412). She had 5/5 strength in her bilateral upper and lower limbs, but an antalgic gait. Id. She also had tenderness to palpation in the right knee and tenderness in her lumbar spine that increased with back extension and rotation. Id. Dr. Sureja ultimately determined Banks' lumbar axial pain "was likely secondary to spondylosis with positive facet provocative maneuvers and also acute sacrolitis from abnormal gait over the past few weeks." Additionally, Dr. Sureja opined she had bilateral knee osteoarthritis with persistent pain and prosthesis failure. He recommended conservative treatment. (R. 413).

Dr. Haynes conducted the scheduled revision surgery on Banks' right knee on March 16, 2011. (R. 414). Though she initially suffered a hematoma post revision, follow-up notes from March 29, 2011 indicate improvement. Films showed "good positioning of her patella on the lateral view," and she required no pain medication at that visit. (R. 415).

8

During an April 2011 consultative examination, Michael Cole, DO reviewed the medical evidence and evaluated Banks' physical residual functional capacity. (R. 64-65). Given her knee condition and back pain, Dr. Cole determined Banks could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, and stand and sit (with normal breaks) for 6 hours in an 8-hour work day, periodically altering between sitting and standing to relieve discomfort. (R. 64). Additionally, she could occasionally climb ramps or stairs, bend at the waist, or crouch, but could never climb ladders, crawl, or kneel. Banks could also frequently balance, and had no manipulative, visual, communicative, or environmental limitations. (R. 65). At the Reconsideration level, Dr. Leopold Moreno, another State agency consultant, also assessed Banks' physical RFC and made identical findings. (R. 74-75).

As recent as May 7, 2012, Wayne MacMasters, MS, PT, performed another functional capacity assessment on Banks at the request of her treating physician, Dr. Haynes. (R. 435). Following that assessment, MacMasters opined that Banks demonstrated an ability to work at the "Light Physical Demand Level."[4] (R. 435). She was able to "sit, stand, and walk independently, bend fully, squat partially, kneel, crawl, climb

---

[4] Specifically, MacMasters considered Banks capable of "peak material handling to 35lbs, occasional material handling to 30lbs, safe frequent material handling to 30lbs, overhead lifting to 20lbs, [and] carrying to 30lbs." (R. 435).

stairs, climb a ladder, reach overhead, and reach forward at shoulder level with both arms." Id. Notwithstanding these capabilities, MacMasters noted functional limitations in any sustained squatting, kneeling, ladder climbing, or working at heights. Id.

In addition to the medical evidence, Banks testified at the May 14, 2012 hearing before the ALJ that the main problem she had prior to the end of 2009 was constant right knee pain. (R. 35). Despite having it replaced in 2007, Banks testified that her condition worsened after a year to the point that it felt as if she "hadn't done anything to it at all." (R. 40). She claimed arthritis "set in" about the same time, and she needs to use a cane to maintain her balance. (R. 36). Since having surgery on her right hand, she still wears a brace occasionally. (R. 41). Banks is able to drive, however, but does so "maybe once or twice a week," since she and her husband have one vehicle, and her husband drives himself to work daily. (R. 32-33). Despite back pain allegedly originating from her knee problems, Banks testified she is still able to complete her normal housework tasks, though "it takes longer" than before 2009, and she requires frequent breaks. (R. 36-38). Her use of pain medication "depends on the weather," but when she takes it, she is "literally knocked out" for 8 to 12 hours. (R. 39). The ALJ also elicited testimony from a vocational expert who

assessed Banks' previous employment as an assembler with Canon as sedentary, semi-skilled work.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's

findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. <u>Perales</u>, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.  <u>ANALYSIS</u>

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); <u>see also</u> 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A).  To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a); <u>see</u> 42 U.S.C. § 423(d)(2)(A).

12

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled.  The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability.  An affirmative answer to question three or five establishes disability.  This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.  The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step.  Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d

31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.    **The ALJ's Decision**

In this case, after first finding that Banks last met the insured status requirements of the Social Security Act on December 31, 2009, her date last insured (R. 16), the ALJ made the following findings under the five part analysis: (1) the ALJ found that Banks had not engaged in substantial gainful activity between June 8, 2004 – the alleged onset date – and December 31, 2009; (2) Banks had severe impairments of status post total right knee replacement, osteoarthritis, and obesity; (3) her combination of impairments did not meet the severity of one of the listed impairments in Appendix 1; and (4) Banks had the RFC to perform sedentary work with a sit/stand option. (R. 14–18). Finally, the ALJ concluded that Banks could perform her past relevant work as an assembler as "[t]his work did not require

14

the performance of work-related activities precluded by [Banks'] residual functional capacity." (R. 20).

Banks' Motion for Summary Judgment makes three related arguments, all of which challenge the ALJ's conclusion that she retained the ability to perform sedentary work with a sit/stand option. She claims generally that the ALJ improperly addressed the treating physician evidence from Dr. Johnson, and more specifically, improperly assigned little weight to Dr. Johnson's January 2011 opinion in light of the Fourth Circuit's recent decision in Bird v. Commissioner of Social Security, 699 F.3d 337 (4th Cir. 2012). Additionally, Banks argues the ALJ failed to analyze the combined effects of her impairments. The Court considers each argument below.

**B.   The ALJ properly evaluated the evidence bearing on Banks' RFC.**

Banks contends the ALJ erred in determining her RFC, which is defined as the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. § 404.1520(e). After doing so, the ALJ uses that RFC at

15

step four of the sequential analysis to determine whether the plaintiff can perform her past relevant work. Id. at § 404.1545(a)(5)(i). If it is determined that the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id. at 404.1545(a)(5)(ii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC. Id. at § 1546(c). RFC is determined by considering all the relevant medical and other evidence[5] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Banks has the RFC to perform sedentary work with a sit/stand option. (R. 18).

  i.  The ALJ properly evaluated Dr. Johnson's opinion
      evidence.

Banks initially contends that the ALJ erred by improperly

---

[5] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

considering and evaluating the evidence submitted by one of her treating physicians, Dr. Johnson. Although Banks consulted with various specialists concerning her orthopedic issues, Dr. Johnson was her primary care physician. Banks contends the ALJ improperly gave little weight to Dr. Johnson's medical opinion concerning the limitations imposed by her impairments. (ECF No. 11 at 15).

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

17

substantial evidence in [the] case record." Id. at §

404.1527(d)(2). Conversely, "if a physician's opinion is not

supported by clinical evidence or if it is inconsistent with

other substantial evidence, it should be accorded significantly

less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every

medical opinion, if the ALJ determines that a treating

physician's opinion is not entitled to controlling weight, it is

"still entitled to deference and must be weighed using all of

the factors provided in [the regulations]." SSR 96-2P, 1996 WL

374188, at *5 (S.S.A.). When the ALJ determines that the

treating physician's opinion should not be given controlling

weight, the ALJ must articulate "good reasons" for his decision.

20 C.F.R. § 404.1527(d)(2).[6]

Here, the ALJ found that Dr. Johnson's statements from

2009, that Banks was "now disabled," and from 2011, that she had

been unable to work because of her "pain and debility," were

entitled to little weight. (R. 19). In doing so, he explained

that these findings were inconsistent with Dr. Johnson's own

examinations of Banks, as well as examinations conducted by

other providers. The ALJ also observed that Dr. Johnson's

statements deviated from the clinical findings and were

---

[6] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions - treating sources, nontreating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(ii).

"inconsistent with evidence of the claimant's condition through her date last insured." Id.

After reviewing the complete record and the ALJ's analysis, the undersigned finds no error in the weight assigned to Dr. Johnson's statements. To begin with, and contrary to Banks' assertion, the ALJ carefully considered Dr. Johnson's statements in light of the record in reaching his conclusion. But he concurred with the opinions of the State agency medical consultants, who gave great weight to the prior ALJ's findings, and determined that Banks could perform work. (R. 19). The ALJ also considered Banks' medical records, including those from Dr. Johnson, and determined her limitations "were not so severe as alleged." Id.

In considering the records, the ALJ noted that Banks' impairments were manageable. For example, he observed her depression was controlled with conservative medication and she had had no complications related to high blood pressure or high cholesterol. Id. Further, despite relatively consistent complaints related to her right knee, there were no significant ongoing complaints regarding her back or right hand. Id. While Banks did reference ongoing back pain in 2011 during two separate appointments with Dr. Johnson and Dr. Sureja, (R. 222, 411-13), her prior records are relatively silent regarding complaints of back pain following Nurse Practitioner Smail's

notes from 2004 and Banks' ensuing breast reduction surgery in 2005.  (R. 267, 361).  Further, Dr. Sureja's recommendation on March 9, 2011 called for conservative treatment, utilizing physical therapy and requiring medication to be used only "as needed." (R. 413). With respect to her hand, Banks' records are predominantly limited to several visits with Dr. Haynes between 2010 and 2011 during which Banks' arthritis was surgically corrected and her condition markedly improved.  (R. 406-10). Indeed, while Banks initially suffered from severe arthritis in her right thumb, she was "doing great" about a year following her surgery and had "really no complaints . . . ." (R. 221).

Moreover, after her knee replacement surgery, the ALJ noted Banks had decreased range of motion in her right knee, "but no edema, instability, or weakness." Id.  She had a normal musculoskeletal range of motion on examination in September 2010, (R. 226), and "she recently demonstrated the ability to work at a limited light physical demand level during a Functional Capacity Evaluation in early May 2012." Id.  Wayne MacMasters, the Physical Therapist who evaluated Banks at Dr. Haynes' request, completed a knee impairment rating summary as part of his report, outlining Banks' knee history as well as the extent of her knee impairment.  (R. 437).  While Banks had moderate medial laxity, she displayed "functional ROM and strength of the right knee, status post total knee replacement."

20

(R. 435).  Additionally, MacMasters noted that as part of a 3-repetition 90-second sustained kneeling position test, Banks sustained kneeling for 84, 90 and 90 seconds, and was able to sustain right kneeling alone for 82, 77 and 63 seconds.  Id. While her "knee laxity was significant enough on exam that [he] would not pass her for working at heights or safe ladder climbing in a competitive work environment," MacMasters determined that Banks was capable of performing work at the light physical demand level.  Id.  All of this medical evidence was in the record and explicitly relied upon by the ALJ when he discounted Dr. Johnson's opinion evidence.

Beyond the medical evidence, the ALJ observed, Banks herself testified that she had no problem completing housework, and even stated she would have been able to continue with her previous employment had she been given a sit/stand option.  (R. 20, 37-38, 41-42).  To be sure, Banks explained it takes her longer to complete her chores as she is required to take periodic breaks to account for her pain, but she also testified she was able to be on her feet as much as she would have liked prior to 2009 and her current use of pain medication "depends on the weather."  (R. 38, 39).  Banks also admitted to having possessed a cane since she left her job with Canon, but does not always use it. (R. 36).  Additionally, she reported having to wear her wrist brace "every now and then" when she sews or

knits. (R. 41).

When evaluating opinion evidence, all of the medical findings and other evidence that support a medical source's statement of disability are considered. Importantly, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean" the claimant will be determined disabled. 20 C.F.R. § 404.1527(d)(1). Such statements relate to a finding reserved for the Commissioner and are never entitled to controlling weight. See 20 C.F.R. § 404.1527(e)(1) and (e)(2); see also Ricks v. Comm'r of Soc. Sec., No. 2:09CV622, 2010 WL 6621693, at *9 (E.D. Va. Dec. 29, 2010). Here, the ALJ considered Dr. Johnson's evidence in light of the record and opted to give greater weight to the prior ALJ and current State agency findings than to her statements. Even so, it should be noted, the ALJ granted Banks a more limited RFC than that determined by the prior ALJ and current State agency findings. Thus, for the reasons outlined above, Banks' general complaint that the ALJ "cursorily" dismissed Dr. Johnson's opinion as "not consistent with the evidence" is not correct. (ECF No. 11 at 15).

Banks' second argument also relates to Dr. Johnson's opinion – specifically the ALJ's alleged failure to consider her January 2011 opinion that Banks "has been unable to work because of her pain and debility," and her conclusion that Banks should

apply for disability due to her "physical limitations and pain." (ECF No. 11 at 9, R. 221-22). Relying on Bird v. Commissioner of Social Security, 699 F.3d 337 (4th Cir. 2012), Banks asserts that Dr. Johnson's 2011 opinion - rendered more than a year after Banks' DLI - should be "linked" back to her pre-DLI complaints.

Bird made clear that "[m]edical evaluations made after a claimant's status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." Bird, 699 F.3d at 340 (citing Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987)). Evidence created after a claimant's DLI that permits an "inference of linkage" between a claimant's post- and pre-DLI condition "could be the 'most cogent proof' of a claimant's pre-DLI disability." Id. (quoting Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)). Accordingly, "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." Id. (quoting Moore, 418 F.2d at 1226). If there is no evidence linking additional impairments to the claimant's condition prior to her DLI, however, the ALJ is not required to retrospectively consider that information. Id. See also Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005).

Bird involved a veteran who was diagnosed with post-traumatic stress disorder ("PTSD") after his DLI, stemming from his service in the Vietnam War. Id. at 339. In denying Bird's claim, the ALJ had relied on the lack of medical evidence from the period prior to his DLI (March 31, 2005), as well as the fact that a Veterans Administration decision finding him 100% disabled became effective in June 2006, 15 months after his DLI. Id. at 340. The ALJ also assigned little weight to a psychological report from July 2007 as it "failed to reflect Bird's pre-DLI condition." Id. In reversing the District Court's decision affirming the ALJ, the Fourth Circuit observed that the "rating decision summarized evidence that Bird suffered from severe symptoms of PTSD before June 2006, and before his DLI. Most notably, the September 2007 psychological examination conducted by the VA indicated that Bird's symptoms of PTSD had been ongoing since his return from military service in Vietnam." Id. at 341. Since that evidence linked Bird's present condition to symptoms he had experienced prior to his DLI, the Court held that it was error not to consider it. Id. at 342.

Unlike the ALJ's opinion in Bird, the ALJ here carefully examined Dr. Johnson's 2011 statement and applied no categorical bar as a result of its timing. In fact, he considered all of the evidence presented, much of which fell outside Banks' DLI – which passed some 3 years prior to the hearing date. He

24

determined Dr. Johnson's statements should be afforded little weight, not because they were dated after her DLI, but because they "were inconsistent with evidence of the claimant's condition through her date last insured." (R. 19). Additionally, Dr. Johnson's 2011 statement is based, at least in part, on Banks' thumb surgery, which occurred in November 2010, almost a year after her DLI, and as a result, there is in fact little linkage between Banks' pre-DLI condition and Dr. Johnson's 2011 opinion. See e.g., Greifenstein v. Colvin, No. 2:13CV81, 2014 WL 198720, at *4 (E.D. Va. Jan. 15, 2014)( "To read Bird to hold that post-DLI medical opinions can, in and of themselves and without any meaningful corroboration by pre-DLI evidence, create an inference of linkage is untenable.").

The ALJ considered all of the medical evidence and properly explained the weight afforded each medical opinion. Accordingly, the undersigned finds the ALJ's determination to afford Dr. Johnson's opinion evidence little weight is supported by substantial evidence in the record.

## ii. The ALJ properly considered Banks' combination of impairments.

Banks also argues that the ALJ's failure to consider the combined effects of her alleged severe and non-severe impairments requires remand. Relying upon Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989), Banks insists that the ALJ's

examination of her severe and non-severe impairments was "fragmented" and "insufficient to satisfy 20 C.F.R. § 404.1523." (ECF No. 11 at 13).

When, as here, a claimant suffers from multiple impairments, the ALJ must consider the combined effect of these impairments in determining the claimant's disability status. See Walker, 889 F.2d at 50. The Commissioner must "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B). The ALJ must also "adequately explain his or her evaluation of the combined effects of the impairments." Walker, 889 F.2d at 50. Because it "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling," the ALJ's failure to adequately explain his evaluation of the combined effects of the impairments is error. Id.

Here, the ALJ provided a succinct analysis of Banks' impairments that considered the prior ALJ's decision, Banks' medical record, and Banks' own testimony. (R. 18). The ALJ concurred with the prior ALJ's finding that Banks' knee impairment, "even considering the combined effects of [her] obesity," did not satisfy the requirements of musculoskeletal listing 1.02 as there "was no evidence to show that [Banks] had

26

an extreme limitation of her ability to walk." Id. Moreover, Banks' impairments, even considering her 2007 total knee replacement, did not satisfy the requirements of musculoskeletal listing 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint) as she was able to ambulate effectively within 12 months. Id. The ALJ recognized that Banks' subsequent records contained clinical evidence of decreased range of motion, but also observed that "they provide no evidence she had significant ambulation difficulties." Id. Lastly, Banks herself testified she was capable of performing housework and "be[ing] on her feet as much as she wanted." Id.

"[A]fter careful consideration of the entire record," the ALJ determined that Banks had the residual functional capacity to perform sedentary work with a sit/stand option. (R. 18). His analysis and the limitations imposed in Banks' highly restrictive RFC demonstrate that he considered the combined effects of her impairments. Given the above, the undersigned finds the ALJ properly considered Banks' impairments, alone and in combination, and his determination is supported by substantial evidence.

## V.    RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT the Commissioner's motion for summary judgment (ECF No. 12), DENY Banks' motion for summary judgment (ECF No.

27

10), and affirm the final decision of the Commissioner.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.  A district judge shall make a de novo determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
April 25, 2014

29